**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

| | | |
|---|---|---|
| **STATE OF ILLINOIS,**<br>**CIRCUIT COURT**<br><br>Madison _____ **COUNTY** | **SUMMONS** | *For Court Use Only* |

| **Instructions ▼** | |
|---|---|
| Enter above the county name where the case was filed. | Urology of St. Louis, Inc. _____<br>**Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | v. |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | **Defendants / Respondents** *(First, middle, last name)*<br>American Healthcare Systems Illinois, LLC _____<br>AHS IL Medical Group, LLC _____ |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

2024LA000053 _____

**Case Number**

RECEIVED
FEB 0 1 2024
MADISON COUNTY
SHERIFF'S OFFICE

# IMPORTANT: You have been sued.

- Read all documents attached to this Summons.

- You MUST file an official document with the court within the time stated on this Summons called an *Appearance* and a document called an *Answer/Response*. If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

- All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.

- You may be charged filing fees, but if you cannot pay them, you can file an Application for Waiver of Court Fees.

- It is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

- Need help? Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents. You can also get free legal information and legal referrals at illinoislegalaid.org. All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- ¿Necesita ayuda? Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.

---

### Plaintiff/Petitioner:

**Do not use this form** in these types of cases:

| | | |
|---|---|---|
| • All criminal cases | • Order of protection | • Adult guardianship |
| • Eviction | • Paternity | • Detinue |
| • Small Claims | • Stalking no contact orders | • Foreclosure |
| • Divorce | • Civil no contact orders | • Administrative review cases |

For eviction, small claims, divorce, and orders of protection, use the forms available at ilcourts.info/forms. If your case is a detinue, visit illinoislegalaid.org for help.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

Enter the Case Number given by the Circuit Clerk: 2024LA000053

| | |
|---|---|
| In **1a**, enter the name and address of the first Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here. | **1. Defendant/Respondent's address and service information:** <br> a. Defendant/Respondent's primary address/information for service: <br> Name *(First, Middle, Last)*: AHS IL Medical Group, LLC <br> Registered Agent's name, if any: _____ <br> Street Address, Unit #: 2100 Madison Avenue <br> City, State, ZIP: Granite City, IL 62040 <br> Telephone: _____ Email: _____ |
| In **1b**, enter a second address for the first Defendant/ Respondent, if you have one. | b. If you have more than one address where Defendant/Respondent might be found, list that here: <br> Name *(First, Middle, Last)*: _____ <br> Street Address, Unit #: _____ <br> City, State, ZIP: _____ <br> Telephone: _____ Email: _____ |
| In **1c**, check how you are sending your documents to this Defendant/ Respondent. | c. Method of service on Defendant/Respondent: <br> ☑ Sheriff ☐ Sheriff outside Illinois: _____ <br> *County & State* <br> ☐ Special process server ☐ Licensed private detective |
| Check here if you are serving more than 1 Defendant/ Respondent. Attach an *Additional Defendant/ Respondent Address and Service Information* form for each additional Defendant/Respondent and write the number of forms you attached. | ☑ **I am serving more than 1 Defendant/Respondent.** <br> I have attached 1 *Additional Defendant/Respondent Address* <br> *Number* <br> *and Service Information* forms. |
| In **2a**, enter the amount of money owed to you. Check **2b** if you are asking for the return of tangible personal property. | **2. Information about the lawsuit:** <br> a. Amount claimed: $ 151,523.00 <br> ☐ b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession). |
| In **3**, enter your complete address, telephone number, and email address, if you have one. | **3. Contact information for the Plaintiff/Petitioner:** <br> Name *(First, Middle, Last)*: Urology of St. Louis, Inc. <br> Street Address, Unit #: 12855 North Forty Drive, Suite 375 <br> City, State, ZIP: St. Louis, MO 63141 <br> Telephone: _____ Email: _____ |
| | **GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties. |
| **Important information for the person getting this form** | You have been sued. Read all of the documents attached to this *Summons*. <br> To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: ilcourts.info/forms. |
| Check **4a** or **4b**. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box **4a**. Otherwise, if the clerk gives you a court date, check box **4b**. | **4. Instructions for person receiving this *Summons* (Defendant):** <br> ☑ a. To respond to this *Summons*, you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served (*not counting the day of service*) by e-filing or at: <br> Address: 155 N. Main Street <br> City, State, ZIP: Edwardsville, IL 62025 |

| | |
|---|---|
| In **4a**, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response*. | |

☐ b. Attend court:

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
     *Date*               *Time*                   *Courtroom*

**In-person at:**

_____ _____ _____ _____
*Courthouse Address*      *City*           *State*      *ZIP*

OR

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

    By telephone: _____
                            *Call-in number for telephone remote appearance*

    By video conference: _____
                                  *Video conference website*

    _____
    *Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at: _____ or visit their website
                              *Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
    *Website*

| | |
|---|---|
| In **4b**, fill out: <br>• The court date and time the clerk gave you. <br>• The courtroom and address of the court building. <br>• The call-in or video information for remote appearances (if applicable). <br>• The clerk's phone number and website. All of this information is available from the Circuit Clerk. | |

| | |
|---|---|
| **STOP!** <br> The Circuit Clerk will fill in this section. | **Witness this Date:**    1/16/2024 <br><br> **Clerk of the Court:**    /s/ Thomas McRae <br>                          ~~/s/ Deana Lackey~~ |

---

**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**

• If 4a is checked, this *Summons* must be served within 30 days of the witness date.

• If 4b is checked, this *Summons* must be served at least 40 days before the court date, unless 2b is also checked.

    o   If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

---

Date of Service: _2-5-24   10:35 AM  Def_ _____ _330_
                     *(Date to be entered by an officer or process server on the copy of this*
                     *Summons left with the Defendant or other person.)*

IN THE CIRCUIT COURT OF MADISON COUNTY
THIRD JUDICIAL CIRCUIT
STATE OF ILLINOIS

| | | |
|---|---|---|
| UROLOGY OF ST. LOUIS, INC., | § | |
| | § | |
| Plaintiff, | § | Case No. |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN HEALTHCARE | § | |
| SYSTEMS ILLINOIS, LLC, et al., | § | |
| | § | |
| Defendants | § | |

## COMPLAINT

COMES NOW Plaintiff Urology of St. Louis, Inc. ("Plaintiff"), by and through its undersigned counsel, and for its Complaint against Defendant American Healthcare Systems Illinois, LLC and Defendant AHS IL Medical Group, LLC (collectively, "Defendants"), states as follows:

### Introduction

1.      This Complaint arises out of Defendants' admitted and knowing refusal to pay what they owe Plaintiff pursuant to two contracts. As set forth below, Defendants admit they are the assignees of obligations owed to Plaintiff under the subject contracts and have admitted they are liable for the same. In fact, Plaintiff has only brought this suit following Defendants reneging on an agreement to pay the principal sums due by their own corporate officer and counsel, who himself proposed and agreed to pay Plaintiff to satisfy those obligations.

### The Parties, Jurisdiction, Venue & Waiver of Jury Trial

2.      Plaintiff is a Missouri corporation doing business in the state of Illinois. Plaintiff is comprised of an established and highly regarded team of medical providers serving the St. Louis and Southern Illinois areas, including Madison County, Illinois.

1

3.     Upon best information and belief, Defendant American Healthcare Systems, Illinois, LLC is an Illinois limited liability company, with its principal place of business at 2100 Madison Avenue, Granite City, Illinois 62040, where it can be served with process pursuant to 735 ILCS 5/2-204.

4.     Upon best information and belief, Defendant AHS IL Medical Group, LLC is an Illinois limited liability company, with its principal place of business at 2100 Madison Avenue, Granite City, Illinois 62040, where it can be served with process pursuant to 735 ILCS 5/2-204.

5.     In May 2021, Plaintiff, as Provider and Contractor, and Granite City Illinois Hospital Company, LLC d/b/a Gateway Regional Medical Center ("Gateway"), as Facility, entered into a Call Coverage Agreement (the "Gateway Agreement"), whereby by Plaintiff agreed to provide defined Services to Gateway at its facility at 2100 Madison Avenue, Granite City, Illinois 62040, in consideration of payment of a Daily Coverage Fee, defined therein.  A true and accurate copy of the executed Gateway Agreement is attached hereto as **Exhibit A**.

6.     In May 2021, Plaintiff, as Provider and Contractor, and Heartland Rural Healthcare, LLC ("Heartland"), as Facility, entered into a Professional Services Agreement (the "Heartland Agreement" and together with the Gateway agreement, the "Service Agreements"), whereby Plaintiff agreed to provide defined Services to Heartland at its facility at 2044 Madison Avenue, Suite G7, Granite City, Illinois 62040, in consideration of payment of Compensation, defined therein.  A true and accurate copy of the executed Heartland Agreement is attached hereto as **Exhibit B**.

7.     On information and belief, effective March 1, 2023, Gateway and Heartland sold their assets to Defendants (and their affiliates), including substantially all of their assets used in connection with the operation of their healthcare facilities which are the subject of the Service

2

Agreements.  In connection with such transactions, both Gateway and Heartland assigned their rights, interests, liabilities, and obligations under the Service Agreements to Defendants (and their affiliates), who knowingly assumed all of Gateway's and Heartland's obligations and liabilities therein to Plaintiff.  In other words, Defendants agreed to be and are responsible and liable for all obligations to Plaintiff arising out of the Service Agreements.

8.      Jurisdiction is proper in this Court pursuant to 735 ILCS 5/2-209, *inter alia*, because Defendants are Illinois corporations and business was transacted pursuant to the Service Agreements in the State of Illinois.

9.      Venue is proper this Court pursuant to 735 ILCS 5/2-101 because Defendants are residents of this county, the Service Agreements were entered into this county and Plaintiff performed the worked called for in the Service Agreements in this county.  Further, the Parties agreed that venue in this Court was proper in the Service Agreements, as the facilities are in this county.

10.     Plaintiff demands that these claims be tried by the Court, without a jury, as Defendants' predecessors-in-interest knowingly, unconditionally and absolutely waived the right to trial by jury in the Service Agreements.

### Count I: Breach of Contract
### (Gateway Facility)

11.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

12.     In May 2021, Plaintiff and Gateway entered into the Gateway Agreement.

13.     Plaintiff has attached the Gateway Agreement to this Complaint and hereby incorporates by reference each of its provisions herein.

14.     Defendants have assumed and are liable for Gateway's obligations to Plaintiff under

3

the Gateway Agreement.

15.     The Gateway Agreement is a valid and enforceable contract.

16.     Plaintiff has performed each of its obligations under the Gateway Agreement including, *inter alia*, providing on-call coverage to the facility and emergency department, defined in the Agreement.

17.     In the Gateway Agreement, the Parties agreed, *inter alia*, that the obligations, compensation and payment agreed to constituted fair market value for the services provided, in light of the cost of obtaining the services from alternative sources, statewide information regarding reimbursement rates for similar services and the application of such information to the specific circumstances of the local market.

18.     Despite Plaintiff's performance of the services required under the Gateway Agreement, Defendants have failed to remit complete payment to Plaintiff for the same.

19.     Defendants' failure and refusal to pay the amounts due and owed to Plaintiff constitutes a material breach of the Gateway Agreement.

20.     As the result of Defendants' breach of the Gateway Agreement, Plaintiff exercised its right under the Gateway Agreement to elect to terminate the Agreement, for cause.

21.     As the result of Defendants' breach of the Gateway Agreement, Plaintiff has been damaged.  Specifically, as of the date of the filing of this Complaint, Defendants have failed to remit payment for Base Compensation and Staffing Expenses owed under the Gateway Agreement, in the amount of at least $92,250.00.

22.     Pursuant to the Gateway Agreement, Plaintiff, as the non-breaching party, is entitled to recover all of its attorneys' fees, costs and expenses incurred, against Defendants.

23.     By bringing this action, Plaintiff specifically seeks to recover all funds, costs,

4

expenses, fees and interest available to it under the Gateway Agreement and at law.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count I for breach of contract, in an amount of at least $92,250, the exact amount of which shall be determined at trial, to award Plaintiff its attorneys' fees, costs and expenses provided under the Gateway Agreement, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

## Count II: Unjust Enrichment
### (Gateway Facility)

24.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

25.     Plaintiff performed each of its obligations under the Gateway Agreement including, *inter alia*, providing on-call coverage to the facility and emergency department, defined in the Agreement, through and until the effective date of its termination for cause.

26.     Defendants have voluntarily retained the benefit of Plaintiff's above services, to Plaintiff's detriment.

27.     Defendants have expressly acknowledged their receipt of the benefit of Plaintiff's above services, including expressly acknowledging the value of the work which it has not paid for to be at least $92,250.00.

28.     Despite their voluntary retention of the benefit of Plaintiff's above services and acknowledgment, Defendants have refused to compensate or pay Plaintiff for the same.

29.     Defendants' retention of the benefit of Plaintiff's above services, without payment to Plaintiff for the same, is to Plaintiff's detriment and violates fundamental principles of justice, equity and good conscience.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count II for unjust enrichment in an amount of at least $92,250.00, the exact amount of which shall be determined at trial, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

### Count III: Quantum Meruit
### (Gateway Facility)

30.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

31.     Plaintiff performed the above services for Defendants' benefit.

32.     Plaintiff did not perform the above services gratuitously.

33.     Defendants accepted and have retained the value of the above services.

34.     Defendants have expressly acknowledged their receipt of the benefit of Plaintiff's above services, including expressly acknowledging the value of the work which it has not paid for to be at least $92,250.00.

35.     Despite their voluntary retention of the benefit of Plaintiff's above services and acknowledgment of the same, Defendants have refused to compensate or pay Plaintiff.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count III for quantum meruit, in an amount of at least $92,250, the exact amount of which shall be determined at trial, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

### Count IV: Account Stated
### (Gateway Facility)

36.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

37.     Plaintiff and Gateway entered into the Gateway Agreement.  By virtue of the above alleged assignment of liabilities, Defendants are responsible for all debts and liabilities to Plaintiff arising out of the Gateway Agreement.

38.     Plaintiff submitted accounts to Gateway and to Defendants setting forth the balance of $92,250.00 pursuant to the Gateway Agreement.

39.     Plaintiff and Defendants agreed that this account was accurate, and that Defendants owed Plaintiff $92,250.00 and promised to pay Plaintiff the same.

40.     Defendants have failed and refused to pay Plaintiff $92,250.00, in material breach of Defendants' promise to pay, which has damaged Plaintiff.

41.     Pursuant to the Gateway Agreement, Plaintiff, as the non-breaching party, is entitled to recover all of its attorneys' fees, costs and expenses incurred, against Defendants.

42.     By bringing this action, Plaintiff specifically seeks to recover all funds, costs, expenses, fees and interest available to it under the Gateway Agreement and at law.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count IV for account stated, in an amount of at least $92,250, the exact amount of which shall be determined at trial, to award Plaintiff its attorneys' fees, costs and expenses provided under the Gateway Agreement, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

## Count V: Breach of Contract
### (Heartland Facility)

43.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

44.     In May 2021, Plaintiff and Heartland entered into the Heartland Agreement.

45.     Plaintiff has attached the Heartland Agreement to this Complaint and hereby incorporates by reference each of its provisions herein.

46.     Defendants have assumed and are liable for Heartland's obligations to Plaintiff under the Heartland Agreement.

47.     The Heartland Agreement is a valid and enforceable contract.

48.     Plaintiff has performed each of its obligations under the Heartland Agreement including, *inter alia*, including providing physician urology services to Heartland's patients at the subject clinic and facility (including performing surgical and other procedures) and staffing the clinic's office with staff members for medical assistant coverage and receptionist coverage.

49.     The obligations, compensation and payment agreed to in the Heartland Agreement constitute fair market value for the services provided in light of the cost of obtaining the services from alternative sources, statewide information regarding reimbursement rates for similar services and the application of such information to the specific circumstances of the local market.

50.     Despite Plaintiff's performance of all services required under the Heartland Agreement, Defendants have failed to completely pay Plaintiff for the same.

51.     Defendants' failure and refusal to make complete payment of amounts due and owed to Plaintiff constitutes a material breach of the Heartland Agreement.

52.     As the result of Defendants' breach of the Heartland Agreement, Plaintiff exercised its right under the Heartland Agreement to elect to terminate the Agreement, for cause.

8

53.     As the result of Defendants' breach of the Heartland Agreement, Plaintiff has been damaged.  Specifically, as of the date of the filing of this Complaint, Defendants have failed to remit payment for Base Compensation and Staffing Expenses owed under the Heartland Agreement, in the amount of at least $151,523.00.

54.     Pursuant to the Heartland Agreement, Plaintiff, as the non-breaching party, is entitled to recover all of its attorneys' fees, costs and expenses incurred, against Defendants.

55.     By bringing this action, Plaintiff specifically seeks to recover all funds, costs, expenses, fees and interest available to it under the Heartland Agreement and at law.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count V for breach of contract, in an amount of at least $151,523.00, the exact amount of which shall be determined at trial, to award Plaintiff its attorneys' fees, costs and expenses provided under the Heartland Agreement, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

### Count VI: Unjust Enrichment
### (Heartland Facility)

56.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

57.     Plaintiff performed each of its obligations under the Heartland Agreement including, *inter alia*, including the provision of on-call coverage to the facility and emergency department, defined in the Agreement, through and until the effective date of its termination for cause.

58.     Defendants have voluntarily retained the benefit of Plaintiff above services, to Plaintiff's detriment.

59.     Defendants have expressly acknowledged their receipt of the benefit of Plaintiff's above services, including expressly acknowledging the value of the work which it has not paid for to be at least $151,523.00.

60.     Despite their voluntary retention of the benefit of Plaintiff's above services and acknowledgment of the same, Defendants have refused to compensate or pay Plaintiff.

61.     Defendants' retention of the benefit of Plaintiff above services, without payment to Plaintiff for the same, is to Plaintiff's detriment, and violates fundamental principles of justice, equity and good conscience.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count VI for unjust enrichment, in an amount of at least $151,523.00, the exact amount of which shall be determined at trial, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

### Count VII: Quantum Meruit
### (Heartland Facility)

62.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

63.     Plaintiff performed the above services for Defendants' benefit.

64.     Plaintiff did not perform the above services gratuitously.

65.     Defendants accepted and have retained the value of the above services.

66.     Defendants have acknowledged their receipt of the benefit of Plaintiff's above services, including expressly acknowledging the value of the work which it has not paid for to be at least $151,523.00.

67.     Despite their voluntary retention of the benefit of Plaintiff's above services and

acknowledgment of the same, Defendants have refused to compensate or pay Plaintiff.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants on its Count VII for quantum meruit, in an amount of at least $151,523.00, the exact amount of which shall be determined at trial, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

**Count VIII: Account Stated**
**(Heartland Facility)**

68.     Plaintiff re-alleges and incorporates by reference each of its allegations above as if set forth herein.

69.     Plaintiff and Heartland entered into the Heartland Agreement.  By virtue of the above alleged assignment of liabilities, Defendants are responsible for all debts and liabilities to Plaintiff arising out of the Heartland Agreement.

70.     Plaintiff submitted accounts to Heartland and to Defendants setting forth the balance of $151,523.00 pursuant to the Heartland Agreement.

71.     Plaintiff and Defendants agreed that this account was accurate, and that Defendants owed Plaintiff $151,523.00and promised to pay Plaintiff the same.

72.     Defendants have failed and refused to pay Plaintiff $151,523.00, in material breach of Defendants' promise to pay, which has damaged Plaintiff.

73.     Pursuant to the Heartland Agreement, Plaintiff, as the non-breaching party, is entitled to recover all of its attorneys' fees, costs and expenses incurred, against Defendants.

74.     By bringing this action, Plaintiff specifically seeks to recover all funds, costs, expenses, fees and interest available to it under the Heartland Agreement and at law.

WHEREFORE, good cause shown, Plaintiff respectfully requests that this Court enter a

11

judgment in its favor and against Defendants on its Count VIII or account stated, in an amount of at least $151,523.00, the exact amount of which shall be determined at trial, to award Plaintiff its attorneys' fees, costs and expenses provided under the Heartland Agreement, to award Plaintiff pre- and post-judgment interest to the fullest extent permissible at law, and to provide Plaintiff any such other and further relief the Court deems just and proper under the circumstances.

Respectfully submitted,

**THE COOK GROUP, PLLC**

/s/  *Brian M. Wacker*
Brian M. Wacker, #6302105
John G. Beseau, #6284680
701 Market Street, Suite 1225
St. Louis, MO 63101
Phone: 314-882-9869
bwacker@cookgrouplegal.com
jbeseau@cookgrouplegal.com

ATTORNEYS FOR PLAINTIFF

12

CW2300683

## CALL COVERAGE AGREEMENT FACE SHEET

**Facility Name**: Granite City Illinois Hospital Company, LLC d/b/a Gateway Regional Medical Center

**Facility's Mailing Address**: 2100 Madison Avenue, Granite City, IL 62040

**Provider Name**: Urology of St. Louis, Inc

**Provider's Mailing Address**: 12855 N 40 Drive Suite 375, Saint Louis, MO 63141

**Call Coverage Specialty**: Urology

**Provider's Physicians Who Will Provide Service Under This Agreement**: Any Urology of St. Louis, Inc physician credentialed as a urologist at Gateway Regional Medical Center

**Start Date**: The day that the Provider will start providing the Services is: June 1 , 2021

**Term**: The Provider will provide the Services for an initial term: **36 Months** (not less than one year)

**Compensation (CHECK ONE ONLY):**

✓ <u>DAILY COVERAGE FEE:</u> Provider assigns to Facility the right to bill and collect for Provider's professional fees. Provider receives a fair market value fee for the call coverage Services of $750.00/day and a fair market value fee equal to 110% of the reimbursement rate as set forth in the applicable Medicare Fee Schedule for all professional medical services that Provider provides to patients in the Facility during the course of providing call coverage Services.

**Exhibit A**

CW2300683

**CALL COVERAGE AGREEMENT**
**STANDARD TERMS AND CONDITIONS**

**THIS CALL COVERAGE AGREEMENT** is entered into by and between Facility and Contractor.

Facility desires to retain Provider to provide the Service set forth on the Cover Sheet, and Provider, possessing the required experience, expertise, licensure, certification, and approvals, desires to provide the Service upon the terms and conditions stated herein. The Agreement is entered into for the purpose of defining the parties' respective rights and responsibilities.

**NOW, THEREFORE,** in consideration of the mutual terms and conditions set forth in this Agreement, the parties, intending to be legally bound, agree as follows:

### Section I - Provider's General Obligations

1) **Provision of the Service and Other Duties.** Provider shall provide the Service as set forth on the attached Cover Sheet, and, as applicable, as set forth in any Exhibit or Addenda attached hereto, each of which are hereby incorporated into the Agreement by this reference, with sufficient qualified, experienced, licensed and certified Provider's Representatives to ensure the timely availability of the Service twenty four (24) hours a day, seven (7) days a week.

   (a) As used in the Agreement, the terms "Provider," "Provider's Representative," and/or "Provider's Representatives" shall all (a) mean Provider and all of Provider's employees, shareholders, partners, subcontractors, and agents of Provider providing Services under the Agreement and (b) have the same meaning regardless of whether they are used individually or collectively in the Agreement.

   (b) It is agreed that continuous Service by Provider (personally by Provider, if Provider is a sole practitioner, and, if Provider is a group, personally by Provider's physicians described on the Cover Sheet) under the Agreement is a material obligation of Provider. No substitutes for Provider may provide Services pursuant to the Agreement without Facility's prior written consent. Notwithstanding the foregoing, Provider shall provide, at Provider's sole cost and expense, a substitute for any Provider's Representative who is unable to provide Services required under the Agreement so as to ensure the uninterrupted availability of the Service. As a condition of providing Services under the Agreement, any such substitute who does not provide professional services on a full time basis through Provider shall first be accepted by Facility's Chief Executive Officer ("CEO") in writing, subject to the CEO's discretion to refuse acceptance of any substitute for any reason, or for no reason, and such substitute shall otherwise comply with each and every term of this Agreement.

2) **Other Requirements.** In connection with this Agreement and Provider's performance of Services under this Agreement, at all times Provider shall:

   (a) cause a Representative to be on call for the Service in accordance with the Facility's call coverage schedule to provide emergency consultation and, whenever requested by the requesting physician, or when required by the condition of the patient, and/or applicable laws, regulations or standard(s) of care, come to the Emergency Department (or elsewhere in the Facility as necessary) and assume responsibility for care of patients who present to the emergency department ("ED") of Facility or elsewhere within Facility, or on Facility's campus seeking care. Each call coverage "day" shall be a continuous 24-hour period as set forth on Facility's official call schedule.

CW2300683

(b) at all times comply with the Emergency Medical Treatment and Active Labor Act, the regulations promulgated thereunder, and the relevant interpretive guidelines (including the State Operations Manual) (collectively, "EMTALA"). Failure to respond to call according to the requirements of EMTALA, the Facility's Medical Staff by-laws, and/or the terms of this Agreement, including, but not limited to the failure to personally come to the Facility when requested by an emergency physician on-duty at Facility, will constitute cause for immediate termination of this Agreement without penalty or prejudice to Facility.

(c) create and complete in a timely manner, and maintain in the location specified by Facility, adequate, legible, and proper records in form and content consistent with Facility's policies and procedures. Records shall include, but are not limited to: administrative and business records related to the Service; physician and mid-level provider staffing schedules, complete and accurate time records in the event that Provider is required to provide Services that are measured in units of time; and records requested by Facility in furtherance of its quality assurance and improvement, utilization review, risk management, and any other programs adopted by Facility to assess and improve quality and efficiency.

(d) comply with all applicable federal, state, and local laws and regulations and the requirements of relevant government/oversight agencies, including, but not limited to, all laws relating to the provision of the Service in the state where Facility is located ("State"), the prevailing standard of care in Facility's community, Facility's bylaws, policies, procedures, rules, and regulations, compliance plans, the standards of the Joint Commission (or, if applicable, the American Osteopathic Association ["AOA"]), the Medicare and Medicaid Conditions of Participation, and any amendments thereto, and all lawful directives issued by Facility's CEO.

(e) assist Facility in maintaining compliance with all professional and ethical requirements and standards established by applicable federal, state, and local licensing or accrediting agencies and bodies and professional associations, including assistance in achieving and maintaining accreditation, certification and/or licensure applicable, in whole or in part, to the Service.

(f) compensate each employee, independent contractor, or other entity or person performing Services under the Agreement, and each Provider's owner, member and/or shareholder in a manner that complies with the Federal Anti-Kickback Statute, an exception to the Stark laws, and an appropriate exception to any state statutes similar to either or both of the foregoing federal statutes, as applicable.

    i. <u>Compensation for physicians practicing in the community outside the scope of this Agreement:</u> With respect to physicians who have private practices or any type of practice providing professional medical services in the Facility's community, or in communities where any affiliate of Facility operates, and with respect to which Provider might contract with to provide certain coverage for Services ("Community Physician(s)"), in addition to the representations and warranties set forth above with respect to compensation, each Community Physician shall be paid (i) a flat fee amount per shift that is consistent with Fair Market Value for the services provided, not taking into account the value or volume of any referrals made to Facility, Facility's affiliate(s), and/or Provider by the Community Physician(s) and (ii) to the extent any such Community Physician's private patients are seen in or admitted to the Facility at the time such Community Physician is providing services for Provider, such patients shall be treated as patients of Provider and Community Physician shall ensure that all rights to receive payments for such services to those patients are reassigned to Provider.

CW2300683

(g) Upon request by Facility, Provider shall negotiate for participation by Provider in such programs and/or networks in which Facility may participate with health maintenance organizations, preferred provider organizations, other payors and physician-hospital organizations. Facility agrees to reasonably assist Provider in negotiating terms of participation. However, in the event Provider fails to agree to terms of participation and, as a result thereof, Facility is threatened with exclusion, expulsion or financial penalties from the network or program or reduced compensation for its Services, then Facility may immediately terminate the Agreement in its entirety for cause. In the event Provider fails to agree to terms of participation with a network or program and, as a result thereof, Facility's compensation from that network or program is reduced in any way, then Facility may immediately terminate the Agreement in its entirety for cause.

Provider shall not balance bill Facility patients who demonstrate valid affiliation with health benefit plans which the Facility is contracted other than appropriate deductibles and co-pays. Balance billing by Provider is a material breach and Facility may immediately terminate the exclusive provisions of this Agreement or terminate the Agreement in its entirety for cause.

Provider warrants and represents that itself, and any third-party collection agency acting on behalf of Provider, shall abide by all laws and regulations, as well as industry standard practices, in any collection efforts for payment of services provided by Provider to Facility patients. Facility may provide notice of a Termination for Cause in the event of a breach of Provider's duties under this paragraph.

Provider warrants and represents that it will charge rates for its services that are consistent with the prevailing rates charged by providers of services of a similar type in the Facility's geographic area. Provider shall provide a copy of its current fee schedule to Facility upon Facility's request at any time.

Provider shall indemnify and hold Facility harmless from any and all actual losses, expenses, damages, claims, fines, penalties, liabilities, judgments, costs and attorneys' fees which are incurred by Facility to the extent solely arising from Provider's breach of this Section of the Agreement.

If requested by Facility, Provider agrees to discount its charges proportionately to any discounts given by Facility to any payer or any patient participation plan, or otherwise specified by Facility as part of any customer service, service recovery or risk management effort. In the event such a request is made by Facility, Facility shall immediately pay to Provider the amount of such discount.

(h) cause each Provider's Representative to submit to periodic, random (or suspicion-based) drug testing in accordance with the policies and procedures as may be established by Facility;

(i) not discriminate on the basis of race, sex, sexual orientation, gender identity, religion, color, national or ethnic origin, age, disability, or military service. Provider expressly agrees to abide by any and all applicable federal and/or state statutes, rules and regulations including, but not limited to, Titles VI and VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Act of 1972, the Age Discrimination In Employment Act of 1967, the Equal Pay Act of 1963, the National Labor Relations Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, and the Occupational Safety and Health Act of 1970, all as may be from time to time modified or amended.

CW2300683

(j) not perform marketing services with respect to the Service. Provider represents and warrants that Provider is not being compensated to provide such marketing services, and further, that no part of the compensation paid hereunder is in exchange for the referral or arrangement for referral of any patient to Facility.

(k) not act (nor permit any omission) in a manner which would be disruptive to Facility, or which would jeopardize the health or safety of any patient or other person. Provider shall not engage in any verbal or physical conduct that adversely affects patient care, or any disruptive behavior that interferes with any person's ability to work in Facility or with any person providing medical, administrative, maintenance, or other services of any kind to, for, or on behalf of Facility, whether such person is an employee, a contractor, or a volunteer.

(l) satisfy such other requirements as are established from time to time by Facility.

3) **Removal of Provider Personnel.** Provider shall immediately remove from Service under the Agreement any Provider's Representative who:

(a) is arrested, indicted, charged with or convicted of a crime other than a minor traffic violation,

(b) has a guardian or trustee of its person or estate appointed by a court of competent jurisdiction,

(c) becomes disabled so as to be unable to perform the duties required by the Agreement,

(d) fails to maintain (or be covered by) either professional or general liability insurance, or both, required by the Agreement,

(e) shall have his or her license(s) and/or privileges required to perform the Service, or otherwise required by the Agreement suspended, revoked, non-renewed, or otherwise limited, whether by the State or any other jurisdiction within or outside of the State, or at the Facility or at any other facility or entity that previously granted privileges,

(f) is suspended, excluded, or debarred from participation in any Federal government payor program,

(g) engages in any conduct that, in Facility's judgment, would adversely affect Facility's reputation, standing in the community, or the care provided to Facility's patients, or

(h) fails to comply with any of the terms and conditions of the Agreement after being given notice of that failure and a reasonable opportunity to comply.

In addition to removing any such individual, Provider shall obtain, at its cost and expense, a substitute for the removed individual or otherwise demonstrate its capabilities for continued coverage and Service required by the Agreement, subject to the right of Facility to accept or reject any Representative or substitute Representative. A breach of this provision shall be a material breach of this Agreement.

4) **Provider's Other Activities.** Provider shall notify Facility of any other arrangements or activities Provider is engaged in (or will engage in) that may present a conflict of interest, or may materially interfere with Provider's performance of its duties and responsibilities under the Agreement, or which may cause a violation of the policies established from time to time by Facility. Upon receipt of such notice, Facility and Provider shall attempt, in good faith, to negotiate an informal resolution of such actual or potential conflict or interference, in a matter satisfactory to Facility. In the event

CW2300683

Provider pursues conduct that does, in fact, in Facility's determination, constitute a conflict of interest or materially interferes with (or is reasonably anticipated by Facility to interfere with) Provider's performance under the Agreement, as determined by Facility, such conduct shall be a material breach of this Agreement.

5) **Insurance Coverage for Provider and any Provider's Representatives**. Provider shall keep and maintain professional and general liability insurance coverage for itself and each individual providing Services on behalf of Provider with such insurance companies, issued upon such forms, and containing such limitations as reasonably acceptable to Facility. Provider's insurer(s) shall be rated A- (or better) by A.M. Best. As a minimum, such insurance shall provide coverage in the amount of One Million and no/100 Dollars ($1,000,000) per occurrence, Three Million and no/100 Dollars ($3,000,000) in the aggregate, separate limits each for General Liability and Professional Liability. If such insurance is maintained on a claims-made basis, such insurance shall continue throughout the term of the Agreement; and upon the termination or expiration of the Agreement, or the expiration or cancellation of the insurance, Provider shall purchase, or arrange for the purchase of, either (i) an extended reporting endorsement ("Tail Coverage") for the maximum period that may be purchased from its insurer (ii) "Prior Acts" coverage from the new insurer with a retroactive date on or prior to the date Provider (or Provider's Representative, as the case may be) began performing Services at Facility, or (iii) maintain continuous coverage with the same carrier for the period of the statute of limitations for personal injury. All such insurance shall be kept and maintained without cost or expense to Facility. In the event Provider does not purchase the required coverage, Facility, in addition to any other rights it may have under the terms of the Agreement or under law, shall be entitled, but not obligated, to purchase such coverage. Facility shall be entitled to immediate reimbursement from Provider for the cost thereof. Facility may enforce its right of reimbursement through set-off against any sums otherwise payable to Provider or any Provider's Representative who failed to maintain the required coverage. Provider shall provide Facility with a certificate or certificates of insurance certifying the existence of all coverage required hereunder. Provider shall request its or their insurance carriers to provide Facility with not less than thirty (30) days prior written notice in the event of a change in the liability policies of Provider. Provider shall request that Facility be named as an additional insured on the liability policy provided that if there is any additional cost to add Facility, then Provider shall advise Facility and Provider shall not be required to add Facility without Facility paying such cost.

6) **Record Availability**. As and to the extent required by law, upon the written request of the Secretary of Health and Human Services, the Comptroller General, or any of their duly authorized representatives, Provider shall make available those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing services under this Agreement. Such inspection shall be available for up to four (4) years after the rendering of such Services. If Provider carries out any of the duties of the Agreement through a subcontract with a value of Ten Thousand and no/100 dollars ($10,000) or more over a twelve (12) month period with a related individual or organization, Provider agrees to include this requirement in any such subcontract. Provider will be solely responsible for and will indemnify Facility for all Facility costs, losses, or failure to receive payments or reimbursements from the United States Government that result from Provider's failure to include such a clause in its subcontract with a related organization. This section is included pursuant to and is governed by the requirements of 42 U.S.C. §1395x (v) (1) (I) and C.F.R. Title 42, Chapter IV, Subchapter B, Part 420, Subpart D, and the regulations as may be amended from time to time thereto. In the event that this Section does not comply with such provisions, this Section will be automatically reformed to so comply and such reformation will be documented in writing and signed by both parties. No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by Facility, Provider, or any Provider's Representative by virtue of the Agreement.

CW2300683

7) **No Sanction**. Neither Provider, nor any of Provider's owners, partners, members, shareholders, directors, employees, contractors, agents or any of its personnel providing services under this Agreement (i) are currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) (the "Federal health care programs"), (ii) have been convicted of a criminal offense related to the provision of health care items or services but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs or Federal contracting, and/or (iii) are under investigation or otherwise aware of any circumstances which may result in Provider, any such person, or any of its personnel providing Services under this Agreement being excluded from participation in the Federal health care programs or debarred from Federal contracting. This is an ongoing warranty and representation, and Provider must immediately notify Facility of change hereto. A breach of this provision shall be a material breach of this Agreement.

8) **No Referrals Required/Regulatory Compliance**. The parties expressly agree that nothing contained in the Agreement shall require Provider to refer or admit any patients to, or order any goods or services from Facility. Notwithstanding any unanticipated effect of any provision of the Agreement, neither party will knowingly or intentionally conduct itself in such a manner as to violate the prohibition against fraud and abuse in connection with the Medicare and Medicaid programs (42 U.S.C. §1320a-7b).

9) **Indemnification**. Provider shall protect, indemnify, and hold harmless Facility and its officers, directors, employees, affiliates, agents, parent, subsidiaries and affiliates ("Facility Indemnitees"), from and defend against any and all claims, demands, actions, settlements, costs, damages, judgments, liability, and expense of any kind (including settlements, judgments, court costs, and attorneys' fees and expenses actually and reasonably incurred, regardless of the outcome of such claim or action) ("Damages") arising out of, based on, resulting from, or in any way related to injuries or damages to persons or property in connection with the provision of Services by Provider hereunder, and including but not limited to, any loss, injury, or damage incurred by Facility as a result of any lapse, suspension, or revocation of the license(s) or certification of Provider or any of Provider's Representatives during the performance of Services pursuant to the Agreement, provided, however, that Provider shall not be obligated under this Agreement to defend, indemnify or hold harmless any Facility Indemnitee from any such loss, liability, damage, cost or expense to the extent such results from a Facility Indemnitee's own negligent or intentional acts or omissions. Facility specifically reserves any common law right of indemnity and/or contribution which it may have against Provider. Notwithstanding anything herein to the contrary, Facility acknowledges and agrees that Provider is not legally obligated to pay amounts to Facility as indemnity for Damages to the extent such obligation would undermine or impair Provider's insurance coverage. In all events, Provider's obligations to indemnify Facility under this Section 9 for Damages shall be limited to the amount of insured indemnity covered under Provider's professional liability policy.

## Section II – Duties of Facility

1) **Compensation**. At all times that this Agreement is in effect, and provided that there are no breaches hereof, and further subject to the terms of Exhibit A hereof, Facility shall pay to Provider the Compensation set forth herein, upon the terms set forth herein, such compensation to be calculated based upon Facility's official call schedule, unless call is provided in increments of less than a full call coverage day, in which case Facility may require written verification of any partial days that the Service was provided, prior to payment being made to Contractor. The coverage schedule shall list individual physicians and shall not list physician groups or other entities.

2) **Space for the Service**. Facility shall provide, at Facility's sole cost and expense, on Facility's premises, space designated by Facility for the Service, plus any expendable medical and office

CW2300683

supplies, and services deemed reasonably necessary for the provision of the Service, unless otherwise specified elsewhere in this Agreement. Facility shall provide, at Facility's sole cost and expense, all medical and office equipment reasonably necessary for Provider to provide Services hereunder in both quantity and type as reasonably required by Provider. Facility shall maintain such equipment in good order and repair, and shall repair or replace such equipment which becomes damaged or worn. Facility shall furnish, at Facility's sole cost and expense, all utilities and services as may be customary for the proper operation and conduct of Department including, without limitation, heat, air conditioning, water, electricity, gas, laundry, janitorial and maintenance services, and telephone services. Facility shall employ or cause to be provided all non-physician technical and clerical personnel it deems necessary for the proper operation of the Service. All salaries, wages, taxes, insurance, worker's compensation insurance and other expenses and benefits incidental to the employment of such non-physician technical and clerical personnel by Facility will be the responsibility and obligation of Facility. Facility retains full administrative control and responsibility for all Facility employed and/or provided non-physician technical and clerical personnel. Facility shall cooperate with Provider to resolve service and other issues Provider identifies with Facility personnel. In the event that such service issues cannot be resolved to Provider's satisfaction, Facility shall cause such personnel to cease to be involved in the Provider's provision of the Services. *At no time shall Provider utilize the Facility's space, supplies, equipment and/or services for the private practice of medicine unless such use is set forth herein with specificity or under that certain Professional Services Agreement between Provider and Facility's affiliate, Granite City Clinic Corporation, and further, that Provider shall pay fair market value compensation for such space, supplies, equipment and/or services used in performing such prohibited outside services.*

3) **Insurance Coverage for Facility**. During the Term of the Agreement, Facility shall keep and maintain professional and general liability coverage for the acts and omissions of Facility, its officers, directors, employees, and agents (excluding Provider, should Provider be deemed to be an agent notwithstanding the contrary intent of the parties). All such insurance shall be issued upon such forms and in such amounts that are customary in Facility's industry.

4) **No Breach**. Facility represents and warrants to Provider that Facility's execution, delivery and consummation of this Agreement and the transactions contemplated hereby will not violate any contract, agreement, or other document to which Facility is a party or to which Facility is otherwise subject.

5) **Exclusivity**. Provider shall be the exclusive provider with which Facility contracts for the Services as described under this Agreement. Prior to Facility or any of its wholly-owned subsidiaries offering urology services at another location, Facility shall first offer Provider the opportunity to be the exclusive provider of urology services for such location. If Provider desires to provide such services, Facility shall either enter into an amendment of this Agreement expanding the Services to include such additional location(s) or enter into a new agreement with Provider for such additional location(s) on terms substantially similar to those contained herein.

### Section III – Term of the Agreement

1) **Term of the Agreement**. The Agreement shall begin on the Start Date as set forth on the cover sheet and shall continue until the end of the Term, and thereafter shall be automatically renewed for successive one (1) year periods under identical terms, unless otherwise terminated as provided herein (such initial term and any such renewal terms being herein called the "Term"). Notwithstanding any contrary provision contained herein, if this Agreement is terminated by either party for any reason during the initial twelve (12) months of the Term, the parties shall not enter

CW2300683

into another agreement for the same or substantially similar services for at least one (1) year from the Start Date.

2) **Termination**.

    (a) **Termination without Cause**. Notwithstanding anything contained herein to the contrary, either party may terminate this Agreement without cause upon at least one hundred twenty (120) days' prior written notice to the other party, such notice stating the intended date of termination; provided, however, that such without cause termination shall not be effective prior to the second anniversary of the Start Date.

    (b) **Termination for Cause**. Subject to the requirements of this Section, either party may terminate this Agreement at any time in the event the other party engages in an act or omission constituting a material breach of any term or condition of the Agreement. The party electing to terminate the Agreement for material breach shall provide the breaching party seven (7) days written notice specifying the nature of the material breach. The breaching party shall have seven (7) days from the date of the notice in which to remedy the breach and conform its conduct to the Agreement. If such breach is not cured within the time specified, the Agreement shall terminate at the end of the seven (7) day notice period without further notice or demand.

    (c) **Immediate Termination**. Notwithstanding anything contained herein to the contrary, Facility may terminate the Agreement immediately upon any of the following events:

        i.    Provider's failure to obtain Facility's prior consent to substitution of personnel;

        ii.    Provider's failure to exclude any Provider's Representative as required by Facility,

        iii.    Upon Provider's loss of certification as a Medicare or Medicaid provider or the exclusion of Provider from participation in Federal Healthcare programs or debarment from Federal Contracting;

        iv.    Upon the sale of all or materially all of Facility's assets, the sale of Facility, or the closure of Facility;

        v.    If Provider is an individual or sole practitioner, upon the death or permanent disability of Provider;

        vi.    Upon Provider's general assignment for the benefit of creditors, Provider's petition for relief in bankruptcy, or under similar laws for the protection of debtors, or upon the initiation of such proceedings against Provider; or

        vii.    As specified elsewhere in this Agreement.

    (d) **Termination or Amendment for Law Changes**. Facility shall have the right to terminate or unilaterally amend this Agreement, without liability, to comply with any legal order issued, or proposed to be issued, by a federal or state agency or to comply with any provision of law or requirement of accreditation, participation, or licensure which: (i) invalidates or is inconsistent with the provisions of this Agreement; or (ii) in the opinion of Facility's legal counsel would cause a party hereto to be in violation of the law.

CW2300683

(e) **Effect of Termination**. Upon the termination or non-renewal of this Agreement for any reason or for no reason, neither party shall have further rights against, or obligations to, the other party except with respect to any rights or obligations accruing prior to the date and time of termination and any obligations, promises, or agreements that expressly extend beyond the termination or which by their nature extend beyond the termination, including, but not limited to, those set out in the sections that pertain to Insurance Coverage, Indemnification, and Confidentiality.

## Section IV – Confidentiality and Restrictive Covenants

1) **Confidential and Proprietary Information**. As used in this Agreement, (i) the term "Confidential Information" means any and all information (in whatever form, whether written, oral, electronic, or otherwise) of Facility relating to Facility or Facility's medical practice or business including, without limitation, the name and address of any patient or Facility, patient records, medical records, charts, files, books, records, fee schedules, methods of operation, business plans, strategies, strategic plans, software databases, existing or contemplated managed care or other payor contracts or the terms thereof of other relationships with payors, financial information, trade secrets, employee matters and any other information of any kind of Facility relating to Facility or Facility's medical practice or business, and (ii) the term "Proprietary Information" means any and all trademarks, trade names, services marks, and copyrighted or patented materials (including, without limitation, Facility's names and/or logos associated therewith) acquired by Facility or used in the medical practice or business of Facility. Provider agrees: (1) that the Confidential Information and Proprietary Information are vital to the business and financial success of Facility and that unauthorized disclosure or use of same would seriously and adversely affect the medical practice and business of Facility; (2) that all Confidential Information and all Proprietary Information are and shall remain the sole property of Facility and that Provider does not and shall not have any ownership interest therein; (3) that all of the Confidential Information is confidential to, and trade secrets of, Facility; (4) to maintain the confidentiality of all Confidential Information and not to disclose, divulge, communicate, or otherwise use any Confidential Information or any Proprietary Information except solely as necessary for the performance of Provider's duties under and in accordance with the terms of this Agreement or as otherwise expressly consented to in writing by Facility; and (5) that if a dispute or controversy arising from or relating to this Agreement is submitted for adjudication to any court or other third party, the preservation of the secrecy of Confidential Information or Proprietary Information may be jeopardized and, accordingly, all pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by Facility, Provider, and their respective counsel and experts, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as may be limited by them in writing.

2) **HIPAA Compliance**. Provider agrees not to use or disclose any Protected Health Information or Individually Identifiable Health Information (as defined in 45 CFR Part 160) (collectively, the "Protected Health Information") concerning any patient of Facility other than as expressly permitted by this Agreement and the requirements of the federal privacy regulations and security standards as contained in 45 CFR Part 164. Provider further agrees to comply with all policies, procedures, and directives of Facility regarding the use and disclosure of Protected Health Information.

3) Intentionally omitted.

4) **No Solicitation**. Provider shall not, directly or indirectly, during any portion of the Term, or for two (2) years immediately after the end of the Term: (i) call on or solicit, or attempt to call on or solicit, any of Facility's past, present, or prospective (as of the date of the expiration or any termination of

CW2300683

this Agreement) patients in any manner which is competitive with Facility's business as conducted as of the expiration or any termination of this Agreement; or (ii) solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee or independent contractor of Facility at any time during the Term or in any manner induce or attempt to induce any such employee or independent contractor of Facility to terminate his or her employment or engagement as such with Facility. Facility shall not, directly or indirectly, during any portion of the Term, and for two (2) years immediately after the end of the Term solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee or independent contractor of Provider at any time during the Term (including, but not limited to, Provider's Representatives) or in any manner induce or attempt to induce any such employee or independent contractor of Provider to terminate his or her employment or engagement as such with Provider; provided, however, that the foregoing shall not prohibit Facility from employing or engaging as an independent contractor any individual who was an employee or independent contractor of Provider and responds to a general solicitation of employment by Facility or any of its affiliates.

5) **Reformation.** If a court determines that any provision of this Section is unreasonably broad, such provision shall not be declared invalid but rather shall be modified by such court to the extent necessary to cause it to be reasonable and lawful.

6) **Remedies.** Each party acknowledges and agrees that a breach or violation of any covenant contained in this Section IV will have an irreparable, material, and adverse effect upon the other and that damages arising from any such breach or violation may be difficult to ascertain. Without limiting any other remedy at law or in equity available , in the event of any breach of any covenant contained in this Agreement, the non-breaching party shall have the right to an immediate injunction enjoining the breach or violation of such covenant or covenants, without the need to post any security or bond. The nonbreaching party shall have the right to receive attorneys' fees, costs, and expenses in the event any litigation or judicial proceeding is necessary to enforce any provision of this Section. Every right and remedy of the nonbreaching party in respect of this Section shall be cumulative and Facility, in its sole discretion, may exercise any and all rights or remedies stated in this Agreement or otherwise available at law or in equity.

### Section V – Miscellaneous Provisions

1) **Governing Law, Venue, and Waiver of Jury Trial.** This Agreement will be governed by, interpreted, and enforced in accordance with the laws of the State in which Facility is located, without giving effect to the conflict of laws rules that would apply the substantive law of another jurisdiction. Venue for any action concerning this Agreement shall be in the county in which Facility is located. In the event that such action is brought in or removed to a federal court and no federal court of competent jurisdiction is located within such county, venue for such action shall lie in the nearest county in which a federal court of competent jurisdiction is located. **THE PARTIES KNOWINGLY, UNCONDITIONALLY, AND ABSOLUTELY WAIVE THE RIGHT TO A JURY TRIAL WITH RESPECT TO ANY CLAIMS ARISING FROM THIS AGREEMENT.** This unconditional jury waiver is a material portion of the consideration provided by Provider to Facility to induce Facility to enter into this Agreement.

2) **Review Required/Entire Agreement/Counterparts.** Neither this Agreement, nor any amendment hereto shall be of force or effect unless having been first electronically reviewed and approved by the Vice President of Operations for QHCCS, LLC, Facility's Management Company, and by Facility's In-House Legal Counsel. The Agreement, including the Face Sheet and Exhibits attached hereto and incorporated herein by reference, contains the entire agreement of the parties and supersedes any and all prior agreements between the parties, written or oral, relating to the

CW2300683

subject matter hereof. This Agreement may not be changed or terminated orally, but may only be changed by an agreement in writing signed by the party or parties against whom enforcement of any waiver, change, modification, extension, discharge, or termination is sought. Any change, amendment, or modification to this Agreement must be both executed by the Chief Executive Officer of Facility or such officer's designee and be electronically reviewed and approved the Vice President of Operations for QHCCS, LLC, Facility's Management Company, and by Facility's In-House Legal Counsel for such amendment or modification to be binding on Facility. The Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

3) **Notices**. Any notice required or desired to be given in respect to the Agreement shall be deemed to be given upon the earlier of (i) actual delivery to the intended recipient or its agent, or (ii) upon the third business day following deposit in the United States mail, postage prepaid, certified mail, return receipt requested, or national courier service (e.g. Federal Express, United Parcel Service, etc.). Any such notice shall be delivered to the respective addresses set out below, or to such other address as a party shall specify in the manner required by this Section. The respective addresses are:

        If to Facility:        As indicated on the Face Sheet

        With Copy to:        Legal Department
                              1573 Mallory Lane, Suite 100
                              Brentwood, TN 37027

        If to Provider:      As indicated on the Face Sheet

4) **Assignment**. Neither party shall assign this Agreement or any portion hereof and nor shall either party delegate any duties under this Agreement, without the prior written consent of the other party, which consent may be withheld for any reason, or for no reason; provided, however, that either party may assign all or any portion of this Agreement to (i) an affiliate or (ii) a third party who acquires all or substantially all of the assets or operations of the assigning party.

5) **Binding Effect; No Third Party Rights**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, and permitted assigns, and nothing in this Agreement, whether express or implied, is intended to confer any right or remedy on any other person or entity.

6) **Waiver**. No waiver of any failure by a party to comply with or perform any provision, covenant, or condition of this Agreement shall be valid unless such waiver is in writing and signed by the other party, nor shall any such waiver be deemed to be a waiver of any preceding of succeeding breach of the same or any other provision, covenant, or condition.

7) **Construction**. The headings set forth in this Agreement are for convenience only and shall have no bearing whatsoever on the interpretation of this Agreement.

8) **Severability**. In case any one or more of the terms or provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be construed so as to be enforceable to the maximum extent permissible by law.

9) **Compliance with Laws**. The parties enter into this Agreement with the intent of conducting their relationship in full compliance with all applicable federal, state, and local laws, including, without

CW2300683

limitation, the federal Stark Law and regulations, the federal Medicare/Medicare anti-fraud and abuse statutes and regulations, the Health Insurance Portability and Accountability Act of 1996 ('HIPAA"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Notwithstanding any unanticipated effect of any of the provisions of this Agreement, neither party shall intentionally conduct itself under the terms and conditions of this Agreement in a manner that constitutes a violation of any law or regulation or in a manner that would jeopardize either party's participation in any federal or state health care program, including without limitation, Medicare or Medicaid. In the event any state or federal law or regulation, now existing or enacted or promulgated after the Start Date, is interpreted by judicial decision, a regulatory agency, or legal counsel of Facility, in such a manner as to indicate that the structure of this Agreement is in violation of any such law or regulation Facility and Provider shall amend this Agreement as necessary to comply with such law or regulation. The parties warrant and represent that the compensation paid to Provider hereunder is consistent with Fair Market Value for the services provided by Provider.

10) **Publicity.** Facility prohibits the use of Facility's, Facility's parent company, subsidiaries, or affiliated hospitals name, trademark, trade name, symbol, or any abbreviation or contraction thereof in any advertisement, press statement or release, website, published customer list, or any publication or dissemination similar to the foregoing without receiving the express written permission from a Vice President of QHCCS, LLC, Facility's Management Company, and Facility's Legal Counsel. Any request for permission should include the complete text of the publication, statement, or document in which the usage will appear and will be subject to denial or edit in Facility's sole discretion.

11) **Material Change in Payment or Cost.** In the event (a) Medicare, Medicaid, any third party payor or any federal, state or local legislative or regulatory authority adopts any law, rule, regulation, policy, procedure, or interpretation thereof which establishes a material change in the method or amount of reimbursement or payment for Services under the Agreement, or if (b) any or all of such payors/authorities impose requirements which require a material change in the manner of either Party's operations under the Agreement and/or the costs related thereto, then, upon the request of either Party materially affected by any such change in circumstances, the Parties shall make such amendments or modifications as may be appropriate in order to accommodate the new requirements and change of circumstances while preserving the original intent of the Agreement to the greatest extent possible.

12) **Relationship of the Parties**. At all times, Provider is an independent contractor, and not a partner, agent of, or joint venturer with Facility, and Provider will not act nor hold Provider out to third parties as Facility's partner, employee, agent or joint venturer. Notwithstanding anything herein to the contrary, Facility will not have or exercise control over the manner in which Provider practices medicine or provides clinical services to patients, and shall not otherwise control or direct the clinical judgment of Provider. The compensation set forth herein shall not be subject to reduction by any withholding for federal, state, or local taxes, Social Security, or similar deductions, it being understood that Provider, including its employees, agents, and subcontractors, if any, is an independent contractor and is responsible for withholding and/or payment of such amounts. Provider hereby agrees to save, indemnify, defend and hold harmless Facility and Facility's affiliates from any and all liability resulting directly or indirectly from Facility's failure to withhold any such amounts from payments due to Provider. In addition, Provider will have no claim under this Agreement, or otherwise, against Facility or Facility's affiliates for vacation pay, sick leave, unemployment insurance, worker's compensation, retirement benefits, disability benefits, or employee benefits of any kind.

CW2300683

13) **Master Contract List**. This contract is identified on a master list of contracts maintained on an electronic database.

14) <u>**LEGAL REVIEW / NEGOTIATED INSTRUMENT**</u>. **PROVIDER EXPRESSLY ACKNOWLEDGES THAT PROVIDER HAS BEEN ADVISED, AND HAS BEEN GIVEN THE OPPORTUNITY, TO REVIEW THIS AGREEMENT WITH PROVIDER'S OWN LEGAL COUNSEL BEFORE ENTERING INTO THIS AGREEMENT, AND PROVIDER HAS READ, UNDERSTOOD, AND AGREES TO BE BOUND BY THE TERMS OF THIS AGREEMENT. THIS IS A NEGOTIATED INSTRUMENT AND SHALL NOT BE STRICTLY CONSTRUED AGAINST A PARTY AS A RESULT OF A PARTY HAVING DRAFTED THIS FORM.**

15) **Force Majeure**. Neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either party.

**IN WITNESS WHEREOF,** the Parties have duly executed this Agreement to be effective on the Start Date.

**PROVIDER**

By: _____
Name: _Matthew Stellman_
Title: _President - USL_

Date of Signature: _5/14/21_

**FACILITY**

By: _____
Name: _Bob Moore_
Title: _CEO_

Date of Signature: _5/17/21_

CW2300683

**Exhibit A**
**Compensation**

1) Facility shall pay to Provider a flat fee of $750.00 for each weekday (Monday - Thursday) and $750.00 for weekend day (Friday, Saturday and Sunday) that Provider provides on-call coverage to the Facility and the Emergency Department ("ED"). Each "day" shall be a twenty-four hour period beginning at 7:00 a.m. on the date stated and ending at 6:59 a.m. the following day. In addition, Facility shall pay Provider fee equal to 110% of the reimbursement rate as set forth in the applicable Medicare Fee Schedule for all professional medical that Provider provides to patients in the Facility during the course of providing call coverage Services.

2) In the event Provider is unable to provide on-call coverage as agreed upon under the terms of this Agreement, Provider shall be solely responsible for providing a substitute and who is appropriately credentialed at Facility in the Specialty to provide the on-call coverage, and who is accepted, in advance, by Facility, subject to Facility's absolute discretion to refuse to accept any substitute provider for any reason or for no reason. Provider shall provide appropriate notice to the Facility administrator responsible for handling the ED on-call schedule in order to place the substitute's name on the call schedule.

3) Facility will make payments on a monthly basis in accordance with its customary practices, but in no event more than ten (10) days after the end of the calendar month in which the on-call coverage was provided.

4) If Provider, while on call, refuses to come to the Facility or otherwise fails to care for any patient for whom Provider is obligated to provide care by virtue of being on call, Provider will not receive the payment provided hereunder for that day and such refusal by Provider, shall be grounds for immediate termination of the Agreement.

5) The parties believe payment hereunder constitutes fair market value for the Services provided in light of the cost of obtaining the Services from alternative sources, statewide information regarding reimbursement rates for similar services and application of such information to the specific circumstances of the local market.

BRADLEY DRAFT 3/25/2021

**CW2300686**

## PROFESSIONAL SERVICES AGREEMENT FACE SHEET

**Facility Name:** Heartland Rural Healthcare LLC

**Facility's Mailing Address:** 2044 Madison Avenue, Granite City, IL 2040

**Provider Name:** Urology of St. Louis, Inc

**Provider's Mailing Address:** 12855 N 40 Drive Suite 375, Saint Louis, MO 63141

**Specialty/Service ("Service") Provider's Physicians Will Cover:** Urology Clinic

**Provider's Physicians Who Will Provide Service Under This Agreement:** Representative of Provider

**Location Where Services will be Provided ("Clinic"):**

> Gateway Urology – Granite City
> 2044 Madison Ave, Suite G7, Granite City, IL 62040

**Start Date:** The day that the Provider will start providing the Services is: May 24 , 2021

**Term:** The Provider will provide the Services for an initial term of: **36 Months** (not less than one year)

**Compensation:**

> All as further described in Exhibit II(1):
>
> Provider receives fair market fee for the Services and assigns the right to receive payment for Provider's professional fees.
>
> $52,083.33 per month
>
> $75.00 per wRVU for each wRVU performed by Provider's physicians in excess of 8,350.

**Exhibit B**

7548005 2.4
Error! Unknown document property name.

BRADLEY DRAFT 3/25/2021

**CW2300686**

**PROFESSIONAL SERVICES AGREEMENT**
**STANDARD TERMS AND CONDITIONS**

**THIS PROFESSIONAL SERVICES AGREEMENT** is entered into by and between Facility and Provider.

Facility desires to retain Provider to provide the Service set forth on the Cover Sheet, and Provider, possessing the required experience, expertise, licensure, certification, and approvals, desires to provide the Service upon the terms and conditions stated herein. The Agreement is entered into for the purpose of defining the parties' respective rights and responsibilities.

 **NOW, THEREFORE,** in consideration of the mutual terms and conditions set forth in this Agreement, the parties, intending to be legally bound, agree as follows:

### Section I - Provider's General Obligations

1) **Provision of the Service and Other Duties**. Provider shall provide the Service as set forth on the attached Cover Sheet, and, as applicable, as set forth in any Exhibit or Addenda attached hereto, each of which are hereby incorporated into the Agreement by this reference, with sufficient qualified, experienced, licensed and certified Provider's Representatives to ensure the timely availability of the Service during the times described on Exhibit I(2).

 (a) As used in the Agreement, the terms "Provider," "Provider's Representative," and/or "Provider's Representatives" shall all (a) mean Provider and all of Provider's employees, shareholders, partners, subcontractors, and agents of Provider providing Services under the Agreement and (b) have the same meaning regardless of whether they are used individually or collectively in the Agreement.

 (b) It is agreed that continuous Service by Provider under the Agreement is a material obligation of Provider. No substitutes for Provider may provide Services pursuant to the Agreement without Facility's prior written consent. Notwithstanding the foregoing, Provider shall provide, at Provider's sole cost and expense, a substitute for any Provider's Representative who is unable to provide Services required under the Agreement so as to ensure the uninterrupted availability of the Service. As a condition of providing Services under the Agreement, any such substitute who does not provide professional services on a full time basis through Provider shall first be accepted by Facility's Chief Executive Officer ("CEO") in writing, subject to the CEO's discretion to refuse acceptance of any substitute for any reason, or for no reason, and shall otherwise comply with each and every term of this Agreement.

2) **Other Requirements**. In connection with this Agreement and Provider's performance of Services under this Agreement, at all times Provider shall:

 (a) Provide the Service as set forth on the Cover Sheet of this Agreement, and in accordance with the specification set forth on Exhibit I(2) attached hereto and made a part hereof.

 (b) Intentionally omitted.

 (c) create and complete in a timely manner, and maintain in the location specified by Facility, adequate, legible, and proper records in form and content consistent with Facility's policies and procedures, copies of which have been provided to Provider. Records shall include, but are not limited to: administrative and business records related to the Service; physician and mid-level provider staffing schedules, complete and accurate time records in the event that Provider is

Page 2 of 15

Error! Unknown document property name.

7548005 2.4

BRADLEY DRAFT 3/25/2021

**CW2300686**

required to provide Services that are measured in units of time; and records requested by Facility in furtherance of its quality assurance and improvement, utilization review, risk management, and any other programs adopted by Facility to assess and improve quality and efficiency.

(d) comply with all applicable federal, state, and local laws and regulations and the requirements of relevant government/oversight agencies, including, but not limited to, all laws relating to the provision of the Service in the state where Facility is located ("State"), the prevailing standard of care in Facility's community, Facility's bylaws, policies, procedures, rules, and regulations, compliance plans, the standards of the Joint Commission (or, if applicable, the American Osteopathic Association ["AOA"]), the Medicare and Medicaid Conditions of Participation, and any amendments thereto, and all lawful directives issued by Facility's CEO. Facility will provide copies of all Facility rules and regulations to Provider.

(e) assist Facility in maintaining compliance with all professional and ethical requirements and standards established by applicable federal, state, and local licensing or accrediting agencies and bodies and professional associations, including assistance in achieving and maintaining accreditation, certification and/or and licensure applicable, in whole or in part, to the Service.

(f) compensate each employee, independent contractor, or other entity or person performing Services under the Agreement, and each Provider's owner, member and/or shareholder in a manner that does not violate the Federal Anti-Kickback Statute, the Stark laws, or any other state statutes similar to either or both of the foregoing federal statutes, as applicable.

  i. Compensation for physicians practicing in the community outside the scope of this Agreement: With respect to physicians who have private practices or any type of practice providing professional medical services in the Facility's community, or any affiliated Facilities' communities, for which Provider might contract with to provide certain coverage for Services ("Community Physician(s)"), in addition to the representations and warranties set forth above with respect to compensation , to the extent such Community Physician's private patients are seen in or admitted to the Facility at the time such Community Physician is providing services for Provider, such patients shall be treated as patients of Provider and Community Physician shall ensure that all rights to receive payments for such services to those patients are reassigned to Provider.

(g) cause each Provider's Representative to submit to periodic, random (or suspicion-based) drug testing in accordance with the policies and procedures as may be established by Facility;

(h) not discriminate on the basis of race, sex, sexual orientation, gender identity, religion, color, national or ethnic origin, age, disability, or military service. Provider expressly agrees to abide by any and all applicable federal and/or state statutes, rules and regulations including, but not limited to, Titles VI and VII of the Civil Rights Act of 1964, the Equal Employment Opportunity Act of 1972, the Age Discrimination In Employment Act of 1967, the Equal Pay Act of 1963, the National Labor Relations Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, and the Occupational Safety and Health Act of 1970, all as may be from time to time modified or amended.

(i) not perform marketing services with respect to the Service. Provider represents and warrants that Provider is not being compensated to provide such marketing services, and further, that no part of the compensation paid hereunder is in exchange for the referral or arrangement for referral of any patient to Facility.

Error! Unknown document property name.

75748 00 52. 4

BRADLEY DRAFT 3/25/2021

**CW2300686**

(j) not act (nor permit any omission) in a manner which would be disruptive to Facility, or which would jeopardize the health or safety of any patient or other person. Provider shall not engage in any verbal or physical conduct that adversely affects patient care, or any disruptive behavior that interferes with any person's ability to work in Facility or with any person providing medical, administrative, maintenance, or other services of any kind to, for, or on behalf of Facility, whether such person is an employee, a contractor, or a volunteer.

(k) use good faith efforts to satisfy such other reasonable requirements as are established from time to time by Facility.

3) **Removal of Provider Personnel.** Provider shall immediately remove from Service under the Agreement any Provider's Representative who:

(a) is arrested, indicted, charged with or convicted of a crime other than a minor traffic violation,

(b) has a guardian or trustee of its person or estate appointed by a court of competent jurisdiction,

(c) becomes disabled so as to be unable to perform the duties required by the Agreement,

(d) fails to maintain (or be covered by) either professional or general liability insurance, or both, required by the Agreement,

(e) shall have its license(s) and/or privileges required to perform the Service, or otherwise required by the Agreement suspended, revoked, non-renewed, or otherwise limited,

(f) is suspended, excluded, or debarred from participation in any Federal government payor program,

(g) engages in any conduct that, in Facility's reasonable judgment, would adversely affect Facility's reputation, standing in the community, or the care provided to Facility's patients, or

(h) fails to comply with any of the terms and conditions of the Agreement after being given notice of that failure and a reasonable opportunity to comply.

In addition to removing any such individual, Provider shall obtain, at its cost and expense, a substitute for the removed individual or otherwise demonstrate its capabilities for continued coverage and Service required by the Agreement. A breach of this provision shall be a material breach of this Agreement.

4) **Provider's Other Activities.** Provider shall notify Facility if any other arrangements or activities Provider is engaged in or will engage in present a conflict of interest, or materially interfere with Provider's performance of its duties and responsibilities under the Agreement, or violate the policies established from time to time by Facility, and Facility and Provider shall attempt, in good faith, to negotiate an informal resolution of such conflict or interference, in a matter reasonably satisfactory to Facility. In the event Provider pursues conduct that does, in fact, in Facility's determination, constitute a conflict of interest or materially interferes with (or is reasonably anticipated by Facility to interfere with) Provider's performance under the Agreement, as determined by Facility, such conduct shall be a material breach of this Agreement.

5) **Insurance Coverage for Provider and any Provider's Representatives.** Provider shall keep and maintain professional and general liability insurance coverage for itself and each individual providing Services on behalf of Provider with such insurance companies, issued upon such forms, and

Error! Unknown document property name.

754800052.4

BRADLEY DRAFT 3/25/2021

CW2300686

containing such limitations as reasonably acceptable to Facility. Provider's insurer(s) shall be rated A- (or better) by A.M. Best. As a minimum, such insurance shall provide coverage in the amount of One Million and no/100 Dollars ($1,000,000) per occurrence, Three Million and no/100 Dollars ($3,000,000) in the aggregate, separate limits each for General Liability and Professional Liability. If such insurance is maintained on a claims-made basis, such insurance shall continue throughout the term of the Agreement; and upon the termination or expiration of the Agreement, or the expiration or cancellation of the insurance, Provider shall purchase, or arrange for the purchase of, either (i) an extended reporting endorsement ("Tail Coverage") for the maximum period that may be purchased from its insurer (ii) "Prior Acts" coverage from the new insurer with a retroactive date on or prior to the date Provider (or Provider's Representative, as the case may be) began performing Services at Facility, or (iii) maintain continuous coverage with the same carrier for the period of the statute of limitations for personal injury. All such insurance shall be kept and maintained without cost or expense to Facility. In the event Provider does not purchase the required coverage, Facility, after notice to Provider and the failure of Provider to procure the required insurance within five (5) days, in addition to any other rights it may have under the terms of the Agreement or under law, shall be entitled, but not obligated, to purchase such coverage. Facility shall be entitled to immediate reimbursement from Provider for the cost thereof. Facility may enforce its right of reimbursement through set-off against any sums otherwise payable to Provider or any Provider's Representative who failed to maintain the required coverage. Provider shall provide Facility with a certificate or certificates of insurance certifying the existence of all coverage required hereunder. Provider shall request its or their insurance carriers to provide Facility with not less than thirty (30) days prior written notice in the event of a change in the liability policies of Provider. Provider shall request that Facility be named as an additional insured on the liability policy provided that if there is any additional cost to add Facility, then Provider shall advise Facility and Provider shall not be required to add Facility without Facility paying such cost.

6) **Record Availability**. As and to the extent required by law, upon the written request of the Secretary of Health and Human Services, the Comptroller General, or any of their duly authorized representatives, Provider shall make available those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing services under this Agreement. Such inspection shall be available for up to four (4) years after the rendering of such Services. If Provider carries out any of the duties of the Agreement through a subcontract with a value of Ten Thousand and no/100 dollars ($10,000) or more over a twelve (12) month period with a related individual or organization, Provider agrees to include this requirement in any such subcontract. Provider will be solely responsible for and will indemnify Facility for all Facility costs, losses, or failure to receive payments or reimbursements from the United States Government that result from Provider's failure to include such a clause in its subcontract with a related organization. This section is included pursuant to and is governed by the requirements of 42 U.S.C. §1395x (v) (1) (I) and C.F.R. Title 42, Chapter IV, Subchapter B, Part 420, Subpart D, and the regulations as may be amended from time to time thereto. In the event that this Section does not comply with such provisions, this Section will be automatically reformed to so comply and such reformation will be documented in writing and signed by both parties. No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by Facility, Provider, or any Provider's Representative by virtue of the Agreement.

7) **No Sanction**. Neither Provider, nor any of Provider's owners, partners, members, shareholders, directors, employees, contractors, agents or any of its personnel providing services under this Agreement (i) are currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) (the "Federal health care programs"), (ii) have been convicted of a criminal offense related to the provision of health care items or services but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs or Federal contracting, and/or (iii) are under investigation or otherwise

Error! Unknown document property name.

7548005.4

BRADLEY DRAFT 3/25/2021

**CW2300686**

aware of any circumstances which may result in Provider, any such person, or any of its personnel providing Services under this Agreement being excluded from participation in the Federal health care programs or debarred from Federal contracting. This is an ongoing warranty and representation, and Provider must immediately notify Facility of change hereto. A breach of this provision shall be a material breach of this Agreement.

8) **No Referrals Required/Regulatory Compliance**. The parties expressly agree that nothing contained in the Agreement shall require Provider to refer or admit any patients to, or order any goods or services from Facility. Notwithstanding any unanticipated effect of any provision of the Agreement, neither party will knowingly or intentionally conduct itself in such a manner as to violate the prohibition against fraud and abuse in connection with the Medicare and Medicaid programs (42 U.S.C. §1320a-7b).

9) **Indemnification**. Provider shall protect, indemnify, and hold harmless Facility and its officers, directors, employees, affiliates, agents, parent, subsidiaries and affiliates ("Facility Indemnitees"), from and defend against any and all claims, demands, actions, settlements, costs, damages, judgments, liability, and expense of any kind (including settlements, judgments, court costs, and attorneys' fees and expenses actually and reasonably incurred, regardless of the outcome of such claim or action) ("Damages") arising out of, based on, resulting from, or in any way related to injuries or damages to persons or property in connection with the provision of Services by Provider hereunder, and including but not limited to, any loss, injury, or damage incurred by Facility as a result of any lapse, suspension, or revocation of the license(s) or certification of Provider or any of Provider's Representatives during the performance of Services pursuant to the Agreement, provided, however, that Provider shall not be obligated under this Agreement to defend, indemnify or hold harmless any Facility Indemnitee from any such loss, liability, damage, cost or expense to the extent such results from a Facility Indemnitee's own negligent or intentional acts or omissions. Facility specifically reserves any common law right of indemnity and/or contribution which it may have against Provider. Notwithstanding anything herein to the contrary, Facility acknowledges and agrees that Provider is not legally obligated to pay amounts to Facility as indemnity for Damages to the extent such obligation would undermine or impair Provider's insurance coverage. In all events, Provider's obligations to indemnify Facility under this Section 9 for Damages shall be limited to the amount of insured indemnity covered under Provider's professional liability policy.

## Section II – Duties of Facility

1) **Compensation.** At all times that this Agreement is in effect, and provided that there are no breaches hereof, and further subject to the requirements of Exhibit II(1) hereof, Facility shall pay to Provider the Compensation set forth herein, upon the terms set forth herein.

2) **Space for the Service**. Facility shall provide, at Facility's sole cost and expense, on Facility's premises, space designated by Facility and approved by Provider for provision of the Service, plus any expendable medical and office supplies, and services deemed reasonably necessary for the provision of the Service, unless otherwise specified elsewhere in this Agreement. Facility shall provide, at Facility's sole cost and expense, all medical and office equipment reasonably necessary for Provider to provide Services hereunder in both quantity and type as reasonably required by Provider. Facility shall maintain such equipment in good order and repair, and shall repair or replace such equipment which becomes damaged or worn. Facility shall furnish, at Facility's sole cost and expense, all utilities and services as may be customary for the proper operation and conduct of Department including, without limitation, heat, air conditioning, water, electricity, gas, laundry, janitorial and maintenance services, and telephone services. Facility shall employ or cause to be provided all non-physician technical and clerical personnel it reasonably deems necessary for the proper operation of the Service, except for mid-level providers employed or contracted by Provider.

Page 6 of 15

75480052.4

BRADLEY DRAFT 3/25/2021

CW2300686

All salaries, wages, taxes, insurance, worker's compensation insurance and other expenses and benefits incidental to the employment of such non-physician technical and clerical personnel provided by Facility will be the responsibility and obligation of Facility. Facility retains full administrative control and responsibility for all Facility employed and/or provided non-physician technical and clerical personnel. Facility shall cooperate with Provider to resolve service and other issues Provider identifies with Facility personnel. In the event that such service issues cannot be resolved to Provider's satisfaction, Facility shall cause such personnel to cease to staff the Clinic or be involved in the Provider's provision of the Services. *At no time shall Provider utilize the Facility's space, supplies, equipment and/or services for the private practice of medicine unless such use is set forth herein with specificity and further, that Provider shall pay fair market value compensation for such space, supplies, equipment and/or services used in performing such prohibited outside services.*

3) **Insurance Coverage for Facility**. During the Term of the Agreement, Facility shall keep and maintain professional and general liability coverage for the acts and omissions of Facility, its officers, directors, employees, and agents (excluding Provider, should Provider be deemed to be an agent notwithstanding the contrary intent of the parties). All such insurance shall be issued upon such forms and in such amounts that are customary in Facility's industry.

4) **No Breach**. Facility represents and warrants to Provider that Facility's execution, delivery and consummation of this Agreement and the transactions contemplated hereby will not violate any contract, agreement, or other document to which Facility is a party or to which Facility is otherwise subject.

5) **Exclusivity**. Provider shall be the exclusive provider with which Facility contracts for the Services as described under this Agreement. Prior to Facility or any of its wholly-owned subsidiaries offering urology services at another location, Facility shall first offer Provider the opportunity to be the exclusive provider of urology services for such location. If Provider desires to provide such services, Facility shall either enter into an amendment of this Agreement expanding the Services to include such additional location(s) or enter into a new agreement with Provider for such additional location(s) on terms substantially similar to those contained herein.

### Section III – Term of the Agreement

1) **Term of the Agreement**. The Agreement shall begin on the Start Date as set forth on the cover sheet and shall continue until the end of the Term, and thereafter shall be automatically renewed for successive one (1) year periods under identical terms, unless otherwise terminated as provided herein (such initial term and any such renewal terms being herein called the "Term"). Notwithstanding any contrary provision contained herein, if this Agreement is terminated by either party for any reason during the initial twelve (12) months of the Term, the parties shall not enter into another agreement for the same or substantially similar services for at least one (1) year from the Start Date.

2) **Termination**.

    (a) **Termination without Cause.** Notwithstanding anything contained herein to the contrary, either party may terminate this Agreement without cause upon at least one hundred twenty (120) days' prior written notice to the other party, such notice stating the intended date of termination; provided, however, that such without cause termination shall not be effective prior to the first anniversary of the Start Date.

Page 7 of 15

754800524

BRADLEY DRAFT 3/25/2021

CW2300686

(b) **Termination for Cause.** Subject to the requirements of this Section, either party may terminate this Agreement at any time in the event the other party engages in an act or omission constituting a breach of any term or condition of the Agreement. The party electing to terminate the Agreement for material breach shall provide the breaching party seven (7) days written notice specifying the nature of the material breach. The breaching party shall have seven (7) days from the date of the notice in which to remedy the breach and conform its conduct to the Agreement. If such breach is not cured within the time specified, the non-breaching party may immediately terminate this Agreement by providing written notice of termination to the breaching party..

(c) **Immediate Termination.** Notwithstanding anything contained herein to the contrary, Facility may terminate the Agreement immediately upon any of the following events:

   i.   Provider's failure to obtain Facility's prior consent to substitution of personnel;

   ii.  Provider's failure to exclude any Provider's Representative as required by Facility,

   iii. Upon Provider's loss of certification as a Medicare provider or the exclusion of Provider from participation in Federal Healthcare programs or debarment from Federal Contracting;

   iv.  Upon the sale of all or materially all of Facility's assets, the sale of Facility, or the closure of Facility;

   v.   If Provider is an individual or sole practitioner, upon the death or permanent disability of Provider;

   vi.  Upon Provider's general assignment for the benefit of creditors, Provider's petition for relief in bankruptcy, or under similar laws for the protection of debtors, or upon the initiation of such proceedings against Provider; or

   vii. As specified elsewhere in this Agreement.

(d) **Termination or Amendment for Law Changes.** If in the opinion of either Facility or Provider, the termination or amendment of Agreement is required to comply with any legal order issued, or proposed to be issued, by a federal or state agency or to comply with any provision of law or requirement of accreditation, participation, or licensure, then the parties will attempt to work in good faith to amend the Agreement in a manner that eliminates such non-compliance. If the parties are unable to agree on an amendment to ensure compliance to their mutual satisfaction within thirty days, then either party may terminate this Agreement immediately by written notice to the other party.

(e) **Effect of Termination.** Upon the termination or non-renewal of this Agreement for any reason or for no reason, neither party shall have further rights against, or obligations to, the other party except with respect to any rights or obligations accruing prior to the date and time of termination and any obligations, promises, or agreements that expressly extend beyond the termination or which by their nature extend beyond the termination, including, but not limited to, those set out in the sections that pertain to Insurance Coverage, Indemnification, and Confidentiality.

### Section IV – Confidentiality and Restrictive Covenants

1) **Confidential and Proprietary Information.** As used in this Agreement, (i) the term "Confidential Information" means any and all information (in whatever form, whether written, oral, electronic, or

Page 8 of 15

Error! Unknown document property name.

7548 00 52.4

CW2300686

otherwise) of Facility relating to Facility or Facility's medical practice or business including, without limitation, the name and address of any patient or Facility, patient records, medical records, charts, files, books, records, fee schedules, methods of operation, business plans, strategies, strategic plans, software databases, existing or contemplated managed care or other payor contracts or the terms thereof of other relationships with payors, financial information, trade secrets, employee matters and any other information of any kind of Facility relating to Facility or Facility's medical practice or business, and (ii) the term "Proprietary Information" means any and all trademarks, trade names, services marks, and copyrighted or patented materials (including, without limitation, Facility's names and/or logos associated therewith) acquired by Facility or used in the medical practice or business of Facility. Provider agrees: (1) that the Confidential Information and Proprietary Information are vital to the business and financial success of Facility and that unauthorized disclosure or use of same would seriously and adversely affect the medical practice and business of Facility; (2) that all Confidential Information and all Proprietary Information are and shall remain the sole property of Facility and that Provider does not and shall not have any ownership interest therein; (3) that all of the Confidential Information is confidential to, and trade secrets of, Facility; (4) to maintain the confidentiality of all Confidential Information and not to disclose, divulge, communicate, or otherwise use any Confidential Information or any Proprietary Information except solely as necessary for the performance of Provider's duties under and in accordance with the terms of this Agreement or as otherwise expressly consented to in writing by Facility; and (5) that if a dispute or controversy arising from or relating to this Agreement is submitted for adjudication to any court or other third party, the preservation of the secrecy of Confidential Information or Proprietary Information may be jeopardized and, accordingly, all pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by Facility, Provider, and their respective counsel and experts, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as may be limited by them in writing.

2) **HIPAA Compliance**. Provider agrees not to use or disclose any protected health information or individually identifiable health information (as defined in 45 CFR Part 160) (collectively, the "Protected Health Information") concerning any patient of Facility other than as expressly permitted by this Agreement and the requirements of the federal privacy regulations and security standards as contained in 45 CFR Part 164. Provider further agrees to comply with all policies, procedures, and directives of Facility regarding the use and disclosure of Protected Health Information.

3) Intentionally omitted.

4) **No Solicitation**. Provider shall not, directly or indirectly, during any portion of the Term, or for one (1) year immediately after the end of the Term: (i) call on or solicit, or attempt to call on or solicit, any of Facility's past, present, or prospective (as of the date of the expiration or any termination of this Agreement) patients in any manner which is competitive with Facility's business as conducted as of the expiration or any termination of this Agreement; or (ii) solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee or independent contractor of Facility at any time during the Term or in any manner induce or attempt to induce any such employee or independent contractor of Facility to terminate his or her employment or engagement as such with Facility; provided, however, that the foregoing shall not prohibit Provider from employing or engaging as an independent contractor any individual who was an employee or independent contractor of Facility and responds to a general solicitation of employment by Provider or any of its affiliates . Facility shall not, directly or indirectly, during any portion of the Term, and for one (1) year immediately after the end of the Term solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee or independent contractor of Provider at any time during the Term (including, but not limited to, Provider's Representatives) or in any manner induce or attempt to induce any such

Error! Unknown document property name.

75480005 .4

BRADLEY DRAFT 3/25/2021

CW2300686

employee or independent contractor of Provider to terminate his or her employment or engagement as such with Provider; provided, however, that the foregoing shall not prohibit Facility from employing or engaging as an independent contractor any individual who was an employee or independent contractor of Provider and responds to a general solicitation of employment by Facility or any of its affiliates.

5) **Provider Access to Records**.   Provider and Facility, understand, agree, and acknowledge that, notwithstanding anything to the contrary in this Article IV, upon termination of this Agreement for any reason: (i) Provider shall be granted reasonable access to, and upon request shall be provided with copies of medical records (at Provider's cost) for all patients of Provider treated at the Facility within six months prior to the date of termination of this Agreement, and any other patients of Provider treated in the Facility that Provider reasonably believes it should be provided in order to provide appropriate care and treatment for such patients; and (ii) Provider shall be permitted to continue the care and treatment of existing patients as of the date of termination, and shall be permitted to communicate directly with patients on matters related to their continuing care and treatment; provided, however, that Provider shall not solicit patients seen hereunder following the date of termination. The parties agree that Hospital shall be solely responsible for providing notice to all patients who received Services at the Facility that Provider is no longer providing services at the Facility, unless Provider demonstrates to Hospital at the time of termination that it has an affirmative legal obligation under applicable law to provide such notice to patients.

6) **Reformation**. If a court determines that any provision of this Section is unreasonably broad, such provision shall not be declared invalid but rather shall be modified by such court to the extent necessary to cause it to be reasonable and lawful.

7) **Remedies**. Each party acknowledges and agrees that a breach or violation of any covenant contained in this Section IV will have an irreparable, material, and adverse effect upon the other and that damages arising from any such breach or violation may be difficult to ascertain. Without limiting any other remedy at law or in equity available, in the event of any breach of any covenant contained in this Agreement, the nonbreaching party shall have the right to an immediate injunction enjoining the breach or violation of such covenant or covenants, without the need to post any security or bond. The nonbreaching party shall have the right to receive attorneys' fees, costs, and expenses in the event any litigation or judicial proceeding is necessary to enforce any provision of this Section. Every right and remedy of the nonbreaching party in respect of this Section shall be cumulative and Facility, in its sole discretion, may exercise any and all rights or remedies stated in this Agreement or otherwise available at law or in equity.

### Section V – Miscellaneous Provisions

1) **Governing Law, Venue, and Waiver of Jury Trial**. This Agreement will be governed by, interpreted, and enforced in accordance with the laws of the State in which Facility is located, without giving effect to the conflict of laws rules that would apply the substantive law of another jurisdiction. Venue for any action concerning this Agreement shall be in the county in which Facility is located. In the event that such action is brought in or removed to a federal court and no federal court of competent jurisdiction is located within such county, venue for such action shall lie in the nearest county in which a federal court of competent jurisdiction is located. **THE PARTIES KNOWINGLY, UNCONDITIONALLY, AND ABSOLUTELY WAIVE THE RIGHT TO A JURY TRIAL WITH RESPECT TO ANY CLAIMS ARISING FROM THIS AGREEMENT.** This unconditional jury waiver is a material portion of the consideration provided by Provider to Facility to induce Facility to enter into this Agreement.

Error! Unknown document property name.

7548 0052. 4

BRADLEY DRAFT 3/25/2021

CW2300686

2) **Review Required/Entire Agreement/Counterparts**. Neither this Agreement, nor any amendment hereto shall be of force or effect unless having been first electronically reviewed and approved by the Vice President of Operations of QHCCS, LLC, Facility's Management Company, and by Facility's In-House Legal Counsel; provided that a duly authorized agent of the Facility, by executing this Agreement or any amendment or modification thereto, is representing and warranting on behalf of the Facility that such review and approvals have been obtained. The Agreement, including the Face Sheet and Exhibits attached hereto and incorporated herein by reference, contains the entire agreement of the parties and supersedes any and all prior agreements between the parties, written or oral, relating to the subject matter hereof. This Agreement may not be changed or terminated orally, but may only be changed by an agreement in writing signed by the party or parties against whom enforcement of any waiver, change, modification, extension, discharge, or termination is sought. Any change, amendment, or modification to this Agreement must be both executed by the Chief Executive Officer of Facility or such officer's designee and be electronically reviewed and approved the Vice President of Operations of QHCCS, LLC, Facility's Management Company, and by Facility's In-House Legal Counsel for such amendment or modification to be binding on Facility. The Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument

3) **Notices**. Any notice required or desired to be given in respect to the Agreement shall be deemed to be given upon the earlier of (i) actual delivery to the intended recipient or its agent, or (ii) upon the third business day following deposit in the United States mail, postage prepaid, certified mail, return receipt requested, or national courier service (e.g. Federal Express, United Parcel Service, etc.). Any such notice shall be delivered to the respective addresses set out below, or to such other address as a party shall specify in the manner required by this Section. The respective addresses are:

|  |  |
|---|---|
| If to Facility: | As indicated on the Face Sheet |
| With Copy to: | Legal Department<br>1573 Mallory Lane, Suite 100<br>Brentwood, Tennessee 37027<br>Attn: General Counsel |
| If to Provider: | As indicated on the Face Sheet |

4) **Assignment**. Neither party shall assign this Agreement or any portion hereof and nor shall either party delegate any duties under this Agreement, without the prior written consent of the other party, which consent may be withheld for any reason, or for no reason; provided, however, that either party may assign all or any portion of this Agreement to (i) an affiliate or (ii) a third party who acquires all or substantially all of the assets or operations of the assigning party.

5) **Binding Effect; No Third Party Rights**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, and permitted assigns, and nothing in this Agreement, whether express or implied, is intended to confer any right or remedy on any other person or entity.

6) **Waiver**. No waiver of any failure by a party to comply with or perform any provision, covenant, or condition of this Agreement shall be valid unless such waiver is in writing and signed by the other party, nor shall any such waiver be deemed to be a waiver of any preceding of succeeding breach of the same or any other provision, covenant, or condition.

Error! Unknown document property name.

75480052.4

BRADLEY DRAFT 3/25/2021

CW2300686

7) **Construction**. The headings set forth in this Agreement are for convenience only and shall have no bearing whatsoever on the interpretation of this Agreement.

8) **Severability**. In case any one or more of the terms or provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be construed so as to be enforceable to the maximum extent permissible by law.

9) **Compliance with Laws**. The parties enter into this Agreement with the intent of conducting their relationship in full compliance with all applicable federal, state, and local laws, including, without limitation, the federal Stark Law and regulations, the federal Medicare/Medicare anti-fraud and abuse statutes and regulations, the Health Insurance Portability and Accountability Act of 1996 ('HIPAA"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Notwithstanding any unanticipated effect of any of the provisions of this Agreement, neither party shall intentionally conduct itself under the terms and conditions of this Agreement in a manner that constitutes a violation of any law or regulation or in a manner that would jeopardize either party's participation in any federal or state health care program, including without limitation, Medicare or Medicaid. In the event any state or federal law or regulation, now existing or enacted or promulgated after the Start Date, is interpreted by judicial decision, a regulatory agency, or legal counsel of Facility, in such a manner as to indicate that the structure of this Agreement is in violation of any such law or regulation Facility and Provider shall amend this Agreement as necessary to comply with such law or regulation. The parties warrant and represent that the compensation paid to Provider hereunder is consistent with Fair Market Value for the services provided by Provider.

10) **Publicity**. Facility prohibits the use of Facility's, Facility's parent company, subsidiaries, or affiliated hospitals name, trademark, trade name, symbol, or any abbreviation or contraction thereof in any advertisement, press statement or release, website, published customer list, or any publication or dissemination similar to the foregoing without receiving the express written permission from the Vice President of Operations of QHCCS, LLC, Facility's Management Company, and Facility's Legal Counsel. Any request for permission should include the complete text of the publication, statement, or document in which the usage will appear and will be subject to denial or edit in Facility's sole discretion.

11) **Material Change in Payment or Cost**. In the event (a) Medicare, Medicaid, any third party payor or any federal, state or local legislative or regulatory authority adopts any law, rule, regulation, policy, procedure, or interpretation thereof which establishes a material change in the method or amount of reimbursement or payment for Services under the Agreement, or if (b) any or all of such payors/authorities impose requirements which require a material change in the manner of either Party's operations under the Agreement and/or the costs related thereto, then, upon the request of either Party materially affected by any such change in circumstances, the Parties shall use their best efforts to make such amendments or modifications as may be appropriate in order to accommodate the new requirements and change of circumstances while preserving the original intent of the Agreement to the greatest extent possible.

12) **Relationship of the Parties**. At all times, Provider is an independent contractor, and not a partner, agent of, or joint venture with Facility, and Provider will not act nor hold Provider out to third parties as Facility's partner, employee, agent or joint venturer. Notwithstanding anything herein to the contrary, Facility will not have or exercise control over the manner in which Provider practices medicine or provides clinical services to patients, and shall not otherwise control or direct the clinical judgment of Provider. The compensation set forth herein shall not be subject to reduction by any withholding for federal, state, or local taxes, Social Security, or similar deductions, it being understood that Provider, including its employees, agents, and subcontractors, if any, is an

Error! Unknown document property name.

754800534

BRADLEY DRAFT 3/25/2021

CW2300686

independent contractor and is responsible for withholding and/or payment of such amounts. Provider will have no claim under this Agreement, or otherwise, against Facility or Facility's affiliates for vacation pay, sick leave, unemployment insurance, worker's compensation, retirement benefits, disability benefits, or employee benefits of any kind.

13) **Master Contract List**. This contract is identified on a master list of contracts maintained on an electronic database.

14) **LEGAL REVIEW / NEGOTIATED INSTRUMENT. PROVIDER EXPRESSLY ACKNOWLEDGES THAT PROVIDER HAS BEEN ADVISED, AND HAS BEEN GIVEN THE OPPORTUNITY, TO REVIEW THIS AGREEMENT WITH PROVIDER'S OWN LEGAL COUNSEL BEFORE ENTERING INTO THIS AGREEMENT, AND PROVIDER HAS READ, UNDERSTOOD, AND AGREES TO BE BOUND BY THE TERMS OF THIS AGREEMENT. THIS IS A NEGOTIATED INSTRUMENT AND SHALL NOT BE STRICTLY CONSTRUED AGAINST A PARTY AS A RESULT OF A PARTY HAVING DRAFTED THIS FORM.**

15) **Force Majeure**. Neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either party.

SIGNATURE PAGE FOLLOWS

**IN WITNESS WHEREOF,** the Parties have duly executed this Agreement to be effective on the Start Date.

**PROVIDER**

By: _____
Name: _Brett Sullivan_
Title: _President_

Date of Signature: _5/7/21_

**FACILITY**

By: _____
Name: _Bob Moore_
Title: _CEO_

Date of Signature: _5/12/21_

Page 13 of 15

Error! Unknown document property name.

7548005.4

BRADLEY DRAFT 3/25/2021

**CW2300686**

**Exhibit I (2)**
**DESCRIPTION OF THE SERVICE**

✓ Provide physician urology Services on behalf of Facility's patients in the "Clinic" or at the Facility (including performing surgical and other procedures) at least forty (40) hours per week collectively in accordance with a schedule determined by Facility in consultation with Provider
  ○ Forty (40) hours per week of physician coverage as described above

✓ Staff the "Clinic" office with staff members recruited and hired by Provider to the extent the cost of such staff members are reimbursed under Exhibit II (1).
  ○ Forty (40) hours per week of medical assistant coverage
  ○ Forty (40) hours per week of receptionist coverage

The parties understand and acknowledge that Provider will staff the Facility with physicians on a rotating basis. While it is the parties' intention that the Provider staff the Facility with one full time physician and related staff five days per week, and the parties understand and acknowledge that while a typical work week is forty (40) hours per week, a physician and staff are also permitted to take off work for vacation days, CME days, and national and other holidays. Accordingly, notwithstanding anything herein to the contrary, Provider shall not be obligated to provide the above physician and staffing (and the number of hours shall be reduced accordingly) on: (i) national holidays and other holidays recognized by Facility's other clinics or outpatient service lines, including, but not limited to, New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day; and (ii) up to but no more than one business day per week for no more than twelve weeks in any calendar year, to permit rotating physicians to take time off for vacation, illness, continuing medical education, or other personal time. Staff will maintain clinic hours a minimum of four days per week during such absences and will make work to schedule and reschedule patient visits during such weeks for days on which the clinic is staffed.

Error! Unknown document property name.

75480052.4

BRADLEY DRAFT 3/25/2021

**CW2300686**

## Exhibit II (1)
## Compensation Details

Facility will reimburse Provider's costs of non-physician "Clinic" office employees (including salary, benefits, and payroll taxes) and administrative costs, as estimated in the table set forth below. Additional staff and administrative costs may be added, or existing staff and administrative costs may be reduced, as mutually agreed on by Provider and Facility in response to changes in patient flow. Provider will cover (subject to the foregoing reimbursement) all employment expenses and payroll expenses for such office employees.

Facility will pay Provider base monthly compensation of $52,083.33 per month for providing the Services.

Reimbursement of staff and administrative costs, and monthly provider payment to Provider for services, shall be made on the first day of each calendar month for costs incurred and Services provided the prior month.

In addition to base monthly compensation, Facility will pay Provider $75.00 per wRVU for each wRVU of Services performed by Provider physicians in excess of 8,350 during the one-year period beginning on the Start Date or any subsequent one year period beginning on the anniversary of the Start Date. Facility will pay Provider such amounts within thirty (30) days of Facility's calculation of the same.

Facility will be entitled to collect professional fees from patients and their payors or insurers attributable to Provider's Services. Facility will utilize Facility's EMR system (Athena) and provide Provider with reasonable access to Facility's records to the extent necessary for Provider's required quality reporting. Upon termination of this Agreement for any reason, Facility will provide Provider with copies of all such medical records and will work cooperatively with Provider to provide such records in an electronic or other form compatible with Provider's existing medical records system.

| Patient encounters per 4-hour clinic | Medical Assistants needed | Office assistants needed | Costs |
|---|---|---|---|
| 0-7 | 1 | 1 | |
| 8-13 | 2 (1.5 if Gateway can handle prior auth/sx scheduling) | 1 | |
| 14+ | 2 | 2 | |

Error! Unknown document property name.

75480052.4

IN THE CIRCUIT COURT OF MADISON COUNTY
THIRD JUDICIAL CIRCUIT
STATE OF ILLINOIS

| | | |
|---|---|---|
| UROLOGY OF ST. LOUIS, INC., | § | |
| | § | |
| Plaintiff, | § | Case No. |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN HEALTHCARE | § | |
| SYSTEMS ILLINOIS, LLC, et al., | § | |
| | § | |
| Defendants | § | |

**AFFIDAVIT**

COMES NOW Brian M. Wacker of The Cook Group, PLLC, pursuant to Illinois Court
Rule 222(b), and hereby states on his oath that the damages sought in the above matter exceed
$50,000. Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil
Procedure, the undersigned certifies that the statements set forth in this instrument are true and
correct.

Respectfully submitted,

**THE COOK GROUP, PLLC**

/s/ *Brian M. Wacker*
Brian M. Wacker, #6302105
John G. Beseau, #6284680
701 Market Street, Suite 1225
St. Louis, MO 63101
Phone: 314-882-9869
bwacker@cookgrouplegal.com
jbeseau@cookgrouplegal.com

ATTORNEYS FOR PLAINTIFF

1

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was served upon Defendants with a copy of the Complaint and Summons as of the date noted on the return summons.

/s/   *Brian M. Wacker* _____